**Seth ROSENFELD, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, et al., Defendants.**

**Nos. C–85–1709 MHP, C–85–2247 MHP.**

United States District Court,
N.D. California.

March 29, 1991.

See also 859 F.2d 717.

Thomas Steel, San Francisco, Cal., for plaintiff.

Lynn K. Richardson, Asst. U.S. Atty., San Francisco, Cal., Stephen J. Murphy, III, Trial Atty., Federal Programs Branch, Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

## OPINION

PATEL, District Judge.

Plaintiff filed this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to obtain documents from the files of the Federal Bureau of Investigation ("FBI"), with processing fees waived under 5 U.S.C. § 552(a)(4)(A). The matter subsequently was referred to a federal magistrate for evaluation of defendants' claims that certain documents were exempt from disclosure under FOIA. The case is now before this court to resolve objections by both plaintiff and defendants to the magistrate's report. Having reviewed the magistrate's report and considered the memoranda of the parties, for the following reasons, the court accepts, with minor modifications, the magistrate's rulings on individual documents; finds that documents in the Free Speech Movement file generated prior to January 19, 1965 satisfy the Exemption (b)(7) threshold showing of law enforcement purpose; finds that documents in the Free Speech Movement file generated January 19, 1965 and after do not meet the Exemption (b)(7) threshold and should be released in their entirety unless they qualify under a different exemption; and adopts the schedule for reprocessing and release of documents outlined below.

## BACKGROUND

Plaintiff Seth Rosenfeld is a journalist and author currently employed by the *San Francisco Examiner*. His areas of specialty are government policy and constitutional rights of individuals. While at the *Examiner* and earlier, as a student journalist for the *Daily Californian* at the University of California, plaintiff wrote a number of articles focusing on the FBI's investigation, surveillance and infiltration of student political groups in the 1960s, including the Free Speech Movement ("FSM") and the anti-war movement. In 1982, plaintiff published a five-part series in the *Daily*

*Californian* entitled "The Berkeley Files: 17 Years of FBI Surveillance in Berkeley." The series won several national journalism awards and was widely reprinted and reported.

Plaintiff is currently gathering materials for a book on the FBI's role in and impact on the political climate of the University of California at Berkeley ("UCB") and the Berkeley community. Beginning in 1981, plaintiff made a series of requests under the Freedom of Information Act for the release of documents from FBI files. When the FBI failed to release the requested documents, and after exhausting his administrative remedies, plaintiff filed two suits under the FOIA's judicial review provision, 5 U.S.C. § 552(a)(4)(B).

Through action number C–85–2247 MHP, plaintiff sought release of eight categories of documents related to his research. He requested FBI documents concerning: 1) Edwin W. Pauley, a former Regent of the University of California, well-known for his opposition to student protesters during the 1960s; 2) Clark Kerr, Chancellor of the Berkeley campus from 1952 to 1958 and president of the University of California system from 1958 to 1967; 3) the Free Speech Movement, a student protest group which existed during 1964 and 1965 at Berkeley and other U.C. campuses; 4) *The Daily Californian,* a U.C. Berkeley student newspaper which reported extensively on the Free Speech Movement, the anti-war movement, and other student activities during the 1960s; 5) Max Scherr, founder, editor and publisher of *The Berkeley Barb,* an "underground" newspaper which played a key role in the political life of Berkeley and the national student movement; 6) Marguerite Higgins, a Pulitzer Prize-winning journalist who wrote extensively about the student and anti-war movements at the University of California; 7) CACTUS, an FBI program monitoring the political activities of certain Berkeley residents;

and 8) James Rector, who was killed by Berkeley Sheriff's officers during the People's Park protest in May 1969.

In action number C–85–1709 MHP, plaintiff sought release of all information contained in file number 105–22479 of the San Francisco field office of the FBI. The information is related to "special operations" conducted as part of the FBI's Counter–Intelligence Program (COINTELPRO) investigating the activities of political organizations. The court consolidated the two actions.

Defendants identified a total of 8,432 pages responsive to plaintiff's request in FBI files. Of those, 1,795 pages were released in their entirety; 4,985 pages were released with redactions; and 1,652 pages were withheld in full. In 1985, the court found, pursuant to the Act, that the information plaintiff received in the released materials would primarily benefit the general public and accordingly held that plaintiff was entitled to a fee waiver under 5 U.S.C. § 552(a)(4)(A). The court therefore ordered that all materials released to plaintiff be provided without duplication charges. Order, C–85–2247 MHP/C–85–1709 MHP, Oct. 29, 1985. The remaining dispute centers on whether defendants have properly withheld all or part of the 6,637 pages for which defendants claim statutory exemptions from disclosure.

Following the release of materials not claimed to be subject to any of the statutory FOIA exemptions, the court referred the matter to Federal Magistrate Claudia Wilken to determine whether defendants properly applied the FOIA exemptions in withholding the remaining documents. In its Order referring the matter, this court instructed the magistrate:

1. To review *in camera* two hundred and fifty (250) documents plaintiffs will select per this order for *Vaughn* indexing[1] to determine whether the Freedom of Information Act ("FOIA") exceptions

---

**1.** *Vaughn* indexing is a procedure whereby agencies claiming that requested documents are exempt from release under FOIA must itemize and index for the court the documents and portions of documents they seek to withhold, in order for the court to assess the applicability of each claimed exemption. *See Vaughn v. Rosen,*

484 F.2d 820 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). The procedure is intended to avoid the necessity of the court's examining each contested document *in camera,* while nonetheless affording the court an opportunity to evaluate defendant's claims of exemption.

that the FBI applies are appropriately taken;

2. To review *in camera* two hundred (200) documents which will be selected by plaintiffs from the pool of documents the FBI has already *Vaughn* indexed to determine whether the FBI has applied the FOIA exceptions fairly;

3. To review on a random basis such other documents filed by defendant and indexed pursuant to *Vaughn* as the Magistrate deems necessary to satisfy herself that exceptions have been properly taken;

4. To evaluate whether the *Vaughn* indexes the FBI has prepared and will prepare as identified in this Order, and the materials they have released consequent to that indexing, conform to the requirements of Magistrate Wilken's July 25, 1986 order.

Order, C–85–2247 MHP/C–85–1709 MHP (Consolidated), March 20, 1987.

On February 3, 1988, the magistrate filed a report of her findings and recommendations. In the report, she concluded that for documents withheld pursuant to 5 U.S.C. § 552(b)(7), the question of whether a sufficient threshold showing of law enforcement purpose had been made with respect to the Free Speech Movement investigation was a close one, and she reserved that question for the court. In addition, in reviewing individual documents, the magistrate found that a substantial number of the exemptions claimed by defendants were not well-taken. She recommended that the court order defendants to release forthwith the documents which were not legitimately exempt and that defendants be required to reprocess the remaining documents in ac-

cordance with her rulings. The magistrate also suggested that plaintiff be given the opportunity to select a further 250 documents for indexing.

Both plaintiff and defendants filed objections to the magistrate's report.

DISCUSSION

I. EXEMPTIONS TO THE FREEDOM OF INFORMATION ACT

■ "Disclosure, not secrecy, is the dominant objective of the Act." *Department of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976). In enacting the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), the goal of Congress was " 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.' " *Id.* (quoting *Rose v. Department of the Air Force*, 495 F.2d 261, 263 (2d Cir.1974)). Accordingly, the basic policy embodied in FOIA is that agency documents are subject to disclosure unless they fall into one of the nine exemptions enumerated in the statute. *See* 5 U.S.C. § 552(b). The exemptions are to be construed narrowly, with the burden on the government to justify exemption. *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 110 S.Ct. 471, 475, 107 L.Ed.2d 462 (1989) (citations omitted); *Church of Scientology of California v. United States Department of the Army*, 611 F.2d 738, 742 (9th Cir.1980).

■ Exemption (b)(7) ("Exemption 7" or "(b)(7)") of the FOIA shields from disclosure "records or information compiled for law enforcement purposes" if disclosure would, or with respect to some exceptions could reasonably be expected to, result in one or more of six specified harms. 5 U.S.C. § 552(b)(7).[2] Information may be

---

**2.** In total, section 552(b)(7) exempts from disclosure:

records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or

authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could

withheld under Exemption 7, therefore, only if both parts of the standard are met. First, a requested document must constitute a record or contain information compiled for law enforcement purposes. If it satisfies this threshold, the agency then must demonstrate that release of the material would threaten one or more of the six harms specified. *Keys v. United States Dept. of Justice,* 830 F.2d 337, 340 (D.C. Cir.1987).

Although many circuits, including the Ninth, accord deference to the judgment of law enforcement agencies such as the FBI in an Exemption 7 threshold determination, *Binion v. United States Department of Justice,* 695 F.2d 1189, 1193–94 (9th Cir. 1983), the agency must nonetheless establish a "rational nexus" between its law enforcement duties and the document for which Exemption 7 is claimed. *Id.* (citing *Church of Scientology,* 611 F.2d at 748). "[T]he FBI must establish that its investigative activities are 'realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached.' " *Powell v. United States Dep't of Justice,* 584 F.Supp. 1508, 1522 (N.D.Cal.1984) (quoting *Pratt v. Webster,* 673 F.2d 408, 420–21 (D.C.Cir.1982)). If an agency "was merely monitoring the subject for purposes unrelated to enforcement of federal law," a threshold showing has not been made. *Lamont v. Department of Justice,* 475 F.Supp. 761, 773 (S.D.N.Y.1979); *but cf. Curran v. Department of Justice,* 813 F.2d 473, 475 (1st Cir.1987) (" 'investigato-ry records of law enforcement agencies are inherently records compiled for "law enforcement purposes" within the meaning of Exemption 7.' ") (quoting *Irons v. Bell,* 596 F.2d 468, 475 (1st Cir.1979)).[3]

## II. FREE SPEECH MOVEMENT

### A. *Rational Nexus*

Plaintiff Seth Rosenfeld contends that the FBI has failed to make a threshold showing that its investigation of the Free Speech Movement and related groups or members was undertaken for a law enforcement purpose. Instead, plaintiff maintains that "the FBI's overriding purpose was to influence social policy and intervene in a controversial political dispute over the handling of the FSM by the UC Administration." Pl. Reply Memorandum re: In Camera Review, August 24, 1987, at 1.

In response, defendants have submitted numerous declarations, including one classified declaration and a classified document index, in support of their position that the activities in question were within the scope of the FBI's authority to investigate law enforcement violations. At a hearing before this court in April 1988, defendants stated, in response to questioning by the court, that the Bureau was investigating possible violations of laws prohibiting seditious conspiracy and violence.

The FBI's Internal Security file on the FSM was opened in October 1964, following campus demonstrations to protest regu-

---

reasonably be expected to endanger the life or physical safety of any individual.

The 1986 amendments to the Freedom of Information Act expanded the coverage of the exemptions from "investigatory records compiled for law enforcement purposes" to "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7) (Supp. IV 1986). In addition, the amendments selectively changed the requirement that disclosure "would" cause one of the enumerated harms to requiring that disclosure "could reasonably be expected to" cause one of the enumerated harms. 5 U.S.C. § 552(b)(7)(A), (C), (D), (E) and (F) (Supp. IV 1986). Because the amendments apply to "any civil action pending on [October 27, 1986]," they govern this action.

**3.** The court notes that while numerous cases have discussed the issue of whether records compiled for an illegal or improper purpose can be exempted from disclosure under Exemption 7, cases actually deciding that issue are rare. *See, e.g., Federal Bureau of Investigation v. Abramson,* 456 U.S. 615, 625, 102 S.Ct. 2054, 2061, 72 L.Ed.2d 376 (1982) (information in law enforcement records remains exempt under Exemption 7 when recompiled in another document for non-law enforcement purposes); *see also Lesar v. United States Dep't of Justice,* 636 F.2d 472 (D.C.Cir.1980) (documents of special task force summarizing FBI surveillance of Dr. Martin Luther King, Jr. were law enforcement records, even if actual surveillance records themselves, where surveillance was for no proper law enforcement purpose, would not qualify as law enforcement records).

lations restricting on-campus political activity. Llewellyn Decl. ¶ 131. Its purpose was to ascertain the influence or involvement in FSM of persons associated with subversive groups, defined by the FBI as "groups whose goals are to achieve political or social change through activities that involve force or violence, or who advocate anarchy, or are under the control or direction of hostile foreign powers." Lieberman Decl. ¶ 7 n. 1. The targeted groups included the Communist Party of the United States of America ("CPUSA"), Young Socialist Alliance, Progressive Labor Party, Socialist Workers Party, and various CPUSA "front-groups," such as the W.E.B. DuBois Club. LLewellyn Decl. ¶ 131.

To satisfy the Exemption 7 threshold, defendants cite the FBI's statutory authority to investigate potential violations of federal law governing espionage and related subversive activities, 18 U.S.C. § 2383 (Rebellion or insurrection), 18 U.S.C. § 2384 (Seditious conspiracy), 18 U.S.C. § 2385 (Advocating overthrow of Government), 50 U.S.C. §§ 781–98 (Internal Security Act of 1950) and §§ 841–44 (Communist Control Act of 1954). They also cite their authority to investigate civil disorders pursuant to various statutes, including 10 U.S.C. §§ 332 and 333 (Insurrection), 18 U.S.C. § 231 (Civil disorders), 18 U.S.C. § 245(b)(3) (Civil Rights–Federally protected activities) and 18 U.S.C. § 2101 (Riots). *Id.*

In addition, defendants seek exemption for a number of documents regarding other groups, including the CPUSA, Socialist Workers Party, Italian–American Cultural Society, and UCB activities other than the FSM that were "channelized" into the FBI–San Francisco file because of references to FSM or related activities. *Id.*

Defendants assert that the FBI investigation was based upon "evidence [that] indicated [the FSM] was heavily influenced, if not at times controlled, by individuals who were members of or affiliated with subversive organizations." Lieberman Decl. ¶ 7. Reference is made to "prominent figures in the FSM" who were members of CPUSA, the Socialist Workers Party and other organizations. However, only two individuals are named: Bettina Aptheker, a member of CPUSA and officer of the Berkeley W.E.B. DuBois Club, who is identified as "principal leader" of the FSM; and Art Goldberg, another FSM leader, who is described as a "publicly professed ... Marxist" but not otherwise alleged to have been a member of ˙or affiliated with any of the enumerated "subversive" organizations. *Id.*

Defendants also cite the need to monitor the FSM because of the potential for civil disorder. They refer to the ongoing public demonstrations and acts of civil disobedience on campus, including the occupation of Sproul Hall at UCB, which resulted in the arrests of approximately 800 demonstrators. *Id.*

█ The presence of a law enforcement purpose in the FSM investigation is a close question. Although defendants' supporting declarations are woefully short on specific detail and long on conclusory assertions, the court finds sufficient evidence that the investigation was opened and initially pursued for the legitimate purpose of ascertaining the role of subversive organizations in the FSM, and the potential for civil disorder in connection with the campus protest. Uncertainty about the origin and leadership of the organization and its role in campus civil disobedience suggest a "plausible basis" for undertaking the investigation. *Pratt,* 673 F.2d at 421 ("in order to carry out its functions, [a law enforcement agency] often must act upon unverified tips and suspicions based upon mere tidbits of information. A court, therefore, should be hesitant to second-guess a law enforcement agency's decision to investigate if there is a plausible basis for its decision.").

However, the court will go on to consider whether the *entire* FSM file satisfies the law enforcement purpose threshold of Exemption 7.

B. *Disintegration of Rational Nexus*

Although the court will uphold a claim of law enforcement purpose by the FBI upon demonstration of a "rational nexus" between its law enforcement duties and the specific documents for which Exemption 7 is claimed, the court is not required "to

sanction agency claims that are pretextual or otherwise strain credulity." *King v. United States Department of Justice*, 830 F.2d 210, 230 (D.C.Cir.1987) (citing *Pratt*, 673 F.2d at 421). The exemption is established "only if it is unrefuted by persuasive evidence that in fact another, nonqualifying reason prompted the investigation, [as] for example [where an investigation is conducted] for purposes of harassment." *Id.* (quoting *Shaw v. FBI*, 749 F.2d 58, 63–64 (D.C.Cir.1984)).

Plaintiffs have argued that the FBI's concerns about subversive influences, seditious conspiracy and civil disorder were without foundation and, more important, that the FBI itself soon recognized that those concerns were without foundation. Plaintiffs have submitted previously released internal FBI documents and memoranda and other exhibits in support of their allegations. Based upon this evidence, the court makes the following observations:

1) The FBI's memorandum of October 20, 1964 describes the Bureau's initial investigation of the FSM. Rosenfeld Decl., Ex. A, Attachment 1. It reports that the protests concerned a university rule barring on-campus political activity, and noted that campus groups, including the Campus Congress of Racial Equality, Young Republicans and Young Democrats set up information tables on campus to protest the rule. The memorandum lists the names of eight students suspended for violating the university rules and briefly describes their political activities. Virtually none of these activities indicate direct involvement with identified "subversive organizations"; they include such activities as Jacqueline Goldberg's role as a delegate from the UCB chapter of Women for Peace to a conference in Moscow in 1963; Mario Savio's participation in a sit-in demonstration at the Sheraton–Palace Hotel in 1964; and Arthur and Jacqueline Goldberg's role in organizing a campus demonstration to prove the inadequacy of fall-out shelters. In addition, the memorandum contains the names and brief descriptions of individuals identified at the Sproul Hall sit-in. The Appendices to the memorandum list and describe various nationwide and local groups suspected of subversive activities. *Id.* at 2.

The information about demonstration participants was furnished to then-Governor Edmund ("Pat") Brown at his request. In reaction to the protests, the governor had informed the FBI of his intention that the Regents take more aggressive action to govern the university in order to prevent university governance by the faculty, which was perceived to be sympathetic to the protests. Rosenfeld Decl., Ex. A, Attachment 2 at 2.

2) Following the arrests of 800 demonstrators at the Sproul Hall sit-in on December 3, 1964, there was massive picketing at all entrances to the campus and to campus buildings. The FBI's memorandum states that all picketing was peaceful, with no incidents reported. It further states that the names of the 800 demonstrators arrested at Sproul Hall would be obtained from confidential sources and "checked against the indices of the San Francisco office." Rosenfeld Decl., Ex. A, Attachment 4 at 6.

3) Although the FBI targeted FSM leader Mario Savio for intensive investigation and surveillance, monitoring his participation in rallies and tracking his plane flights around the country, a memorandum dated December 10, 1964 states that "[t]o date investigation has not developed any information indicating that Savio has been affiliated with any subversive groups; however, during the current demonstrations at Berkeley he has been been extremely close to and in frequent company of Bettina Aptheker"; Aptheker is identified by the author of the memorandum as "an active member of the CP [Communist Party] and leader in the DuBois Youth Club." Rosenfeld Decl., Ex. A, Attachment 6 at 3.

4) The FBI undertook an investigation into the role of Professor Leon Wofsy in the Academic Senate, a majority of whose members supported the FSM and the student demonstrators. In a memorandum dated December 12, 1964, the Bureau concludes that Wofsy, who had been active in the CP prior to 1965, "has had only a minor part, if any, in promoting the unrest in

connection with the student demonstrations," and that as one of the 1500 members of the Academic Senate, "[Wofsy] has exerted no more influence on final decisions than any other single faculty member." Rosenfeld Decl., Ex. A, Attachment 8 at 1, 3.

Moreover, the December 12 memorandum reports that the demonstrations concerned an internal university matter, concluding that "three basic groups are involved in this campus dispute: administration, faculty and students." *Id.* at 2.

5) Further background checks continued to reveal few demonstrators having affiliations with subversive groups, and no significant control or influence by such groups in the FSM. A letterhead memorandum dated December 14, 1964 reports that FSM leaders Mario Savio, Stephen Weissman and Suzanne Goldberg "have not been identified to date as participants in subversive groups." Rosenfeld Decl., Ex. A, Attachment 10 at 2. Again Bettina Aptheker is identified as an FSM leader and member of the Communist Party.

Particularly revealing evidence of defendant's realization that the Free Speech Movement was not controlled by subversive organization and did not threaten imminent civil disorder is found in the final paragraph of the December 14, 1964 memorandum, which states:

> This is another good example of a demonstration which, *while not communist originated or controlled, has been exploited by a few communists for their own end. This whole affair points to the need for the Bureau to take all action within its jurisdiction to protect over 26,000 students at the University from a few hundred students containing within their ranks a handful of communists that would mislead, confuse and bewilder a great many students to their own detriment.* While this memorandum concerns only the University of California at Berkeley, the same things could happen at other colleges across the land. We need to and

will give continuous attention to this matter. *Id.* at 3 (emphasis added).

6) A memorandum dated December 18, 1964 reports that despite repeated FBI directives to substantiate the involvement of subversive organizations in the FSM, "[i]t would appear from the information available to date that although there were subversives who took part in the demonstrations that [sic] *the demonstrations would have taken place anyway and no information has been received or developed to date that these demonstrations were suggested, operated, or controlled by the communist pary* [sic]." Rosenfeld Decl., Ex. A, Attachment 15 at 7 (emphasis added). The memorandum also notes that the FSM was composed of many campus organizations, including the Campus College Republicans, Conservatives for an Open Campus, and Young Democrats. *Id.*

7) This failure to substantiate that the FSM was influenced or controlled by subversive organizations, or that it posed a significant threat to civil order, is a continuing theme of subsequent memoranda. For example, an airtel dated January 8, 1965 reports that "sufficient information has not been developed to show a degree of influence by the Communist Party, either before or during the demonstrations," and that "subversive participation in the demonstrations did not have any bearing on the measure of success achieved.... [T]he demonstrations would have taken place with or without any participation by subversives, because of the basic grievances." Rosenfeld Decl., Ex. A, Attachment 16 at 2.

8) A memorandum dated January 19, 1965 sharply distinguished the campus FSM demonstrations from the 1960 San Francisco City Hall demonstrations protesting the House Un–American Activities Committee's issuance of subpoenas to witnesses with suspected communist affiliations. Rosenfeld Decl., Ex. A, Attachment 18 at 2. The memorandum noted that "[i]n the current UC demonstration, communist affiliation or participation is not of primary concern to any of the demonstrators.... [T]here were over 22 different

organizations involved, raging [sic] in views from the far left to the far right ... plus a large number of demonstrators who are not affiliated with any organization." It concludes: *"No information has been reported from any confidential informants indicating that the CP played a direct role in the UC demonstrations." Id.* (emphasis added).

### C. Conclusion

Plaintiff Rosenfeld has submitted detailed documentary evidence indicating that the FBI conducted extensive investigation and surveillance of the Free Speech Movement and its participants from the FSM's inception. It also is clear that the FBI concluded on the basis of its own information that the FSM was concerned with a matter of internal university administration and not subversive causes; that the FSM was not controlled by subversive organizations; that the vast majority of the student leaders of the FSM were not affiliated with any of the enumerated subversive organizations; and that neither national security nor civil order were threatened by the campus protests.

The evidence proferred by the plaintiff, consisting almost exclusively of documents from the FBI's own files, is highly persuasive on these issues. Thus the case at bar clearly is distinguishable from *Keys v. United States Dept of Justice,* 830 F.2d 337 (D.C.Cir.1987). In *Keys,* the court upheld an Exemption 7 claim on a minimal showing of law enforcement purpose, finding that the plaintiff/requester had presented no evidence to refute, and had offered no reason to suspect, the government's colorable claim. *Id.* at 341–43.

Although the court finds that the FBI investigation of the FSM was begun in good faith and with a plausible basis, it is also evident that the Bureau's continued investigation revealed that there was *little or no* "information sufficient to support at least 'a colorable claim' of [the investigation's] rationality." *Pratt v. Webster,* 673

F.2d at 420–21. This is clearly a case in which what began as a colorable claim based on scant evidence ceased to be a colorable claim as the evidence accumulated. What may have begun as a good faith effort to determine the extent of participation and influence in the FSM by subversive organizations appears to have become a case of routine monitoring of the FSM for intelligence purposes. Such routine monitoring, surveillance and information-gathering is not a permissible law enforcement purpose under Exemption 7. *Lamont v. Dept. of Justice,* 475 F.Supp. at 773–76.

Attempting to identify a date certain on which the FBI's investigation lost its rational nexus and took on a nonqualifying purpose is like trying to identify the moment at which a once-hirsute man became bald. However, the court concludes that at least by January 19, 1965,[4] the FBI's initial law enforcement-related suspicions were demonstrably unfounded. The court thus will treat that date as a cut-off point for the scope of a law enforcement purpose exemption under (b)(7).

Therefore, the court finds:

(1) that the defendants have established a law enforcement purpose for FSM documents generated prior to January 19, 1965; and that all such documents or portions of documents may be withheld if they satisfy the second prong of the test for Exemption 7. However, the court also finds that plaintiff has provided persuasive evidence that by January 19, 1965, another, nonqualifying purpose came to drive the FBI's continued monitoring and investigation of the FSM.

(2) Thus, all documents and portions of documents in the FSM file generated from January 19, 1965 forward do not satisfy the Exemption 7 threshold and may not be withheld unless they have been held to fall within the terms of another exemption.

---

**4.** The memorandum of that date concludes, as did earlier memoranda, that there is no information indicating that the Communist Party had a direct role in the UC demonstrations; that the demonstrations were focused on internal

university policy; and that participation in the FSM included a broad range of student organizations. Rosenfeld Decl., Ex. A, Attachment 18 at 2.

(3) The James Rector documents submitted to the court are entitled to exemption under section 552(b)(7) since they all relate to a legitimate law enforcement purpose, viz., the investigation and prosecution of persons involved in the death of James Rector. The extent to which exceptions are granted under (b)(7) is set forth in the Appendix.

(4) To the extent that exemptions are claimed for portions of the Marguerite Higgins file pursuant to (b)(7), they are not well-taken. There is nothing in the Higgins documents that indicates any legitimate law enforcement purpose within the purview of the statutes and case law discussed above. However, other exemptions under (b)(1) and (b)(2) are permitted as discussed in the Appendix. References to informant numbers continue to be deleted under (b)(1). Except as deletions are permitted in the Appendix, all of the documents shall be released.

(5) The Clark Kerr documents as a whole are not entitled to a(b)(7) exemption since it is clear that they do not relate to any investigation performed in connection with a legitimate law enforcement purpose. To the extent that discrete items within those documents are subject to (b)(7) exemptions, they are discussed in the Appendix along with other claimed exemptions. Except for the deletions allowed in the Appendix, the documents shall be turned over in their entirety.

(6) In the Max Scherr documents, only three references are made to portions of entries under (b)(7). These appear to be related to legitimate law enforcement activity and, unless provided otherwise in the Appendix, are entitled to a(b)(7) exemption.

## III. MAGISTRATE'S FINDINGS AND RECOMMENDATIONS

### A. *Specific Findings*

Magistrate Claudia Wilken has carefully and thoroughly reviewed *in camera* four hundred and fifty (450) documents already *Vaughn*-indexed or selected for *Vaughn*-indexing by the plaintiff. In addition, defendants were permitted to submit additional declarations, including *in camera* declarations, in support of the claimed exemptions, and the plaintiff was permitted to file a factual response in the form of a "counter-*Vaughn* index," with documentary exhibits. Having reviewed the magistrate's findings and the parties' objections to those findings, the court adopts the magistrate's analysis of individual deletions with only minor changes, which are reflected below.

In addition, in light of the court's finding that the Exemption 7 threshold has been met with respect to the FSM file *only for those documents generated prior to January 19, 1965*, the magistrate's findings with respect to FSM documents have been modified to reflect this holding. Thus, FSM documents generated from January 19, 1965 forward must be released unless defendants have claimed and the court has recognized the applicability to these deletions of other exemptions under the Freedom of Information Act or the Privacy Act.

Finally, in those instances mentioned below where further declarations will be permitted, such declarations should be provided within thirty (30) days from the date of this order.

### B. *Representative Rulings*

Both the general and specific rulings below should be viewed as representative rulings. The remainder of the documents identified in plaintiff's FOIA request, which were not part of the *in camera* sample, shall be reprocessed in a manner consistent with these rulings, and release of these reprocessed documents shall be made within thirty (30) days of the date of this order.

For purposes of this reprocessing, the court adopts the plaintiff's proposed test for "representative rulings." Pl. Opp. to Def. Obj. to Magistrate's Report at 2–3. Thus, identical documents or documents containing identical information, and similar documents or documents containing substantially identical information, are to be released to the same extent as documents reviewed *in camera* and ruled upon.

## C. *Further Vaughn Indexing*

The court assumes that all requested documents have been *Vaughn*-indexed and orders that they be processed in accordance with the findings below taken as representative rulings.

If, however, plaintiff has requested documents which have not yet been *Vaughn*-indexed, the parties shall so advise the court within twenty (20) days of the date of filing of this order. Defendants will then have thirty (30) days from the date of such notice to the court to submit the indices. Defendants should also provide the court *in camera* with the names of all sources deleted from the indexed document to permit the court to check those names against plaintiff's list of previously disclosed or deceased sources. A Special Master to be compensated by the defendants will then review these additional indices and documents.

IT IS SO ORDERED.

### APPENDIX: ANALYSIS OF INDIVIDUAL DELETIONS

### EXHIBIT B—FREE SPEECH MOVEMENT DOCUMENTS

*Document 2* In view of this court's holding in its Opinion *supra* at 1445–50, Exemption 7 is not well-taken. The document was generated after January 19, 1965. Since no legitimate law enforcement nexus exists, the exceptions in (b)(7)(A)–(F) do not apply. Therefore, the document must be released in its entirety.

The court denies plaintiff's request to release the *in camera* declarations made by defendants with respect to deletions that had originally been made on pages 4, 5 and 7, or with respect to any other deletions.

*Document 27* The document itself is entitled to exemption as a pre-January 19, 1965 transmittal. However, the organizational affiliation and location of the source shall be disclosed; the size of the organization, the nature of the information, and the passage of time make it unlikely that this would lead to disclosure of the source.

*Document 42* This document is exempt under (b)(7), since it originated before January 19, 1965. Therefore, the court turns to the (b)(7) exceptions. The organizational affiliation of the source on page 1, paragraph 1 could reasonably be expected to reveal the source due to limited access to the detailed information provided. This source did ask for confidentiality. The (b)(7)(D) exemption is upheld.

The only justification for deletion of the names in the list of files to which copies of this information were routed, hereinafter referred to as the copy count, is privacy. [Exemption (b)(7)(C)]. Here, as is frequently the case below, it is well-known that the individuals in question engaged in activities which made it very likely that the FBI would take an investigative interest in them. Confirmation that the FBI did take such an interest adds little or nothing to whatever consequences the already-public knowledge of their activities may have. The names shall be disclosed.

Deletions on page 2, paragraphs 2 and 5, are two of the few instances in which plaintiff seeks disclosure of the identities of Special Agents for a particular reason. The court finds that the reason advanced here does outweigh the agents' privacy interests and that the names should be disclosed.

Exemption (b)(7)(E), law enforcement techniques, is claimed for the deletion on page 2, paragraph 4. The particular pretext used in the telephone call described here is personal to Mario Savio; the general category of pretext would leap to the mind of the most simpleminded investigator, to paraphrase Judge Peckham in *Dunaway v. Webster*, 519 F.Supp. 1059, 1070 (N.D.Cal.1981). It shall be disclosed.

On page 3, paragraph 2, the New York City Police Unit, but not the officer's name, shall be disclosed. Due to the nature of the information and the passage of time, it is unlikely that disclosure of the unit would lead to the identity of the officer. The officer's name is exempt pursuant to (b)(7)(C). Paragraph 4 shall be disclosed. There is no privacy interest here since the names are mentioned elsewhere and the

document itself recites that no information was located about them.

*Document 51* Under the court's Exemption 7 holding, this document is exempt subject to the following exceptions. On page 1 the prefix to Wofsy's file number should be released. It is already public knowledge that he engaged in activity likely to bring about this type of investigation. Although the magistrate upheld the deletions on pages 6, 7 and 8 under (b)(1) or (b)(7)(D) or (b)(6), the court finds that paragraphs 1 and 2 on page 6 contain information that is likely to have been public knowledge in light of the rest of the article and therefore shall be disclosed. In addition, pages 7 and 8 indicate that Wofsy knew he was talking to an FBI agent. Finally, at page 8 with regard to Dondoroff, the number of sources and generalized nature of the information are not likely to result in disclosure of sources. Therefore, the information on pages 6, 7 and 8 shall be released in full.

Deletions at pages 9 and 10 concern information that is generally known and not private, and so could not reasonably be expected to identify the source or impermissibly invade the subject's privacy. Defendants have released some of this information as of November 2, 1987, after the briefing on the documents selected for *in camera* review.

It is not clear from defendants' submission whether they are claiming the second prong of exemption (b)(7)(D) with regard to page 9, paragraph 1. As noted, the material could not reasonably be expected to identify the source and thus is not exempt under the first prong. The second prong protects material received from confidential sources and compiled in a criminal or national security investigation, apparently without regard to whether the material would identify the source. This test is more rigorous than that which is required to find a law enforcement purpose to justify a(b)(7) claim. *Powell v. United States*, 584 F.Supp. 1508 at 1530 (N.D.Cal.1984). The information here does not appear to be compiled for the purpose of a criminal or legitimate national security investigation and shall be released.

*Document 52* This is a pre-January 19, 1965 transmittal and is generally exempt under (b)(7). Some of the documentation provided by plaintiff in this case leads the court to conclude that the source protected at page 1, paragraph 3 is one whose identity and role have already been disclosed. The (b)(7)(D) exemption is therefore overruled. The names in the copy count deletions shall be disclosed; the FBI's interest in these individuals is already evident, as discussed above. The same is true of the name on page 3, paragraph 1. The privacy interest is especially attenuated here since no information was located on this person. The names and addresses on page 2 are properly deleted pursuant to Exemption (b)(7)(D), as an implied assurance of confidentiality can be inferred from the circumstances. Page 3, paragraph 4 protects a source, whose desire for confidentiality can be inferred as a matter of fact from the document. Exemptions (b)(7)(C) and (D), or (b)(6) are appropriate.

*Document 72* Since this document is dated February 2, 1965, it is not exempt under the court's opinion and shall be turned over in its entirety.

*Document 75* The face of the document, obtained from a source, does not disclose the source or indicate that it was accessible to only a few persons, as defendants allege. One entire page has been withheld from *in camera* review without explanation. Moreover, the document bears no date. The court therefore concludes that defendants have failed to establish that the document comes within the narrow exclusion of (b)(7) and orders its release.

*Document 77* The date that is deleted here could disclose the source under the circumstances. The date and name are exempt since they predate the period set by the court in its opinion.

*Document 92* This document is not exempt since it was generated after January

19, 1965. It shall be released in its entirety.

*Document 128* This post-January 19, 1965 document is not exempt and shall be turned over.

*Document 129* Since this document is referred to in Document 128, it shall also be released. Even though this memorandum was issued before January 19, 1965, it is not an agency-generated memorandum; it is a CBS News release. Its significance for agency purposes was indicated by the March 4, 1965 transmittal, which is Document 128. Therefore, Document 129 shall also be disclosed.

*Documents 139 and 140* The (b)(7) exemption is denied pursuant to this court's Opinion. The document shall be released subject to the (b)(1) deletions. Unless the source appears on plaintiff's lists of deceased or revealed sources, the (b)(1) exemptions will stand.

*Documents 150–313* Documents 150, 151, 161, 181, 188, 218, 256, 257, 258, 267, 268, 283, 284 and 313 are all post-January 19, 1965. In fact, many of them are dated several years later. For example, Document 268 is pertinent to another era. However, as to the following documents the (b)(1) deletions are upheld unless the source appears on plaintiff's lists of deceased or revealed sources:

*Document 150* Lines 1, 5 and 8 could reasonably be expected to disclose a confidential source and may be deleted unless the source appears on plaintiff's lists of deceased or revealed sources. [Exemption (b)(1)]. Lines 6 and 7, however, would not lead to the identity of the source and shall be disclosed.

*Document 188* Defendants have made an adequate showing of the confidentiality of the source whose identity is protected in this document, pursuant to exemption (b)(1). Portions of the redacted information could reasonably be expected to identify the source. The first page may therefore be deleted. However, since the document indicates that there were approximately 100 people present, disclosure of the rest is not likely to lead to the source. Therefore, pages 2 and 3 shall be disclosed up to the words "Action," etc. on page 3.

*Document 321* This document, dated October 29, 1964, satisfies the threshold under this court's holding on Exemption 7. Applying the (b)(7) exceptions, the name and position of the Post Office employee who gave this information to the FBI are properly deleted. [Exemption (b)(7)(C) or (b)(6)]. The name of the Post Office box holder shall be disclosed. Defendants do not dispute plaintiff's allegation that commercial Post Office box holders are not entitled to confidentiality. Since the name and the connection with the Free Speech Movement are not confidential, the further fact that the FBI took an interest in this person is self-evident and detracts no further from the privacy interests of the individual.

*Document 342* Exemption 7 applies to this document pursuant to the court's Opinion. However, the subject of this document and his role are well-known and, with the exception of personal information, protection of his identity is unjustified. The source in paragraph 2 is not an undisclosed source and shall be revealed. The other party mentioned in paragraph 2 and in the copy count is also well-known and in addition is deceased. His name shall be disclosed. (It was in fact disclosed on November 2, 1987, after the briefing on the documents selected for *in camera* review). Both of these names were on plaintiff's list of previously released names, provided to defendants in June, 1986.

*Documents 352–402* Each of these documents is dated before the court-delineated cut-off date of January 19, 1965, and is entitled to exemption with the exceptions under (b)(7) as noted below:

*Document 352* The deletion in the copy count is a person well known to have engaged in activities likely to bring him to the attention of the FBI, and thus disclosure of his name in this context would detract no further from his privacy interests.

*Document 355*  The name in the first deletion and the fact mentioned about him appear in other documentation submitted by plaintiff and thus shall be disclosed here.

*Document 357*  Plaintiff does not seek the names of commercial institutions that provided information to the FBI; the name of the source may remain deleted.  The information would disclose the source, and therefore may remain deleted.  The first two deletions on page 4 shall be disclosed because the person in question is well-known.

*Document 368*  The deletions in this document again rely upon an inference, not accepted by this court, that non-federal law enforcement agencies would not wish it known that they cooperate with the FBI. Deletion is particularly unjustified for those on plaintiff's list of previously revealed sources.  Unless a further factual showing can be made, these (b)(7)(D) deletions are not well-taken.

*Document 371*  Because this person's activities with respect to the Free Speech Movement are well-known, his file number, name and all of the information in this document, with the exception of paragraphs 2 and 3 on page 2 and the last paragraph on page 3, shall be released. The deleted paragraphs invade the subject's privacy, and this invasion is not outweighed by the public interest.  [Exemption (b)(7)(C)].  (The prefix of his file number was released on November 2, 1987). The name in the copy count should also be revealed.

*Document 373*  The names, but not the positions, of law enforcement officers may be deleted.  The holder of the Post Office box mentioned in paragraphs 3 and 4 shall be disclosed since, as discussed above, commercial Post Office box holders are not entitled to confidentiality.  However, the handwritten note invades the privacy of a third party, which is not outweighed by the public interest.  [Exemption (b)(7)(C)].

*Document 402*  The name deleted in this document is only a first name, and a common one at that.  Release would not identify the person, especially given the passage of time.  It shall be revealed.

*Document 408*  This document, dated January 25, 1965, is not exempt under (b)(7) and shall be released.

*Document 414*  The exemption under (b)(7) is upheld since this document predates January 19, 1965.  However, the names in the copy count shall be disclosed since they are disclosed elsewhere.  It is clear that they engaged in activities likely to cause them to be of investigative interest to the FBI, and confirmation that they were in fact of investigative interest to the FBI discloses nothing more.  Some of the names were released on November 2, 1987. The deletion of the names of the Special Agents from the body of the report is proper as their privacy interests outweigh any public interest in their identity.  The one exception to this is the name of an agent whose identity and activities in this context are already well-known.  His name shall be disclosed.

*Document 427*  This document shall be released, since the court's holding on Exemption 7 excludes it from the exemption.

*Document 436*  The (b)(7) exemption applies to this document which pre-dates January 19, 1965.  In addition, the names and file numbers of these confidential sources are properly deleted.  However, the rest of paragraph 1 could be disclosed without identifying these sources.  The remainder of the document details activities among such a small group of persons that their disclosure could reasonably be expected to identify the source.  [Exemptions (b)(7)(D)].  The information is such that it would also impermissibly implicate the privacy interests of the third parties mentioned.

*Documents 454–753*  All of these documents lack a legitimate law enforcement nexus based on the court's holding and, except as noted below, shall be released in their entirety.

*Document 495* Portions of this document are exempt under (b)(1) because they contain information regarding intelligence sources. The claims asserted under (b)(1) for other portions of the memorandum are not well-taken. The type of information disseminated to the informant is not sufficiently specific so as to identify the informant. Nor would it disclose intelligence methods. The "method" described is nothing more than what a reasonable person would do in order to obtain information in the ordinary course of her affairs. Therefore, pages 1, 2 and 3 shall be released with the informant's name, address and other identifying information deleted. The locator numbers and names or other identifying information of any Special Agents may also be deleted.

*Document 634* Although this document is not entitled to an exemption under (b)(7), it contains information on a small group activity which could identify the source and is therefore exempt under (b)(1). The context is adequate to justify an inference of an implied assurance of confidentiality and defendants make an adequate showing that the source is alive and undisclosed. All of the deletions are properly taken.

*Documents 759 and 760* These documents are pre-January 19, 1965 and are exempt under (b)(7) except as follows: There is no indication that the person whose identity is protected by these deletions wished to have his views kept confidential. The views are not particularly personal, and the public interest outweighs whatever limited privacy interests this person may have. The third party mentioned tangentially in Document 760 is publicly known to have played the role mentioned here and thus also need not be protected.

EXHIBIT C—JAMES RECTOR FILE

*Document 8* The paragraph of text on the cover page shall be released. The defendants state that this paragraph refers to information given by a non-federal law enforcement agency but this fact, if true, does not appear in the text. Furthermore, for the reasons discussed above it does not appear that knowledge of the cooperation of federal and non-federal law enforcement agencies would be deleterious to either. The field office deleted from the copy count shall be disclosed. As will be noted below, the witness whose identity might be revealed by the disclosure of this field office shall be disclosed in any event. The handwritten word on the lower left hand corner shall be disclosed since the paragraph of text is to be disclosed. The Special Agents' names at the top and at the bottom may be deleted here as elsewhere.

The person whose identity is concealed by the deletions on page 10 shall be revealed. There is no indication that (s)he spoke pursuant to either an express or implied assurance of confidentiality and his or her position is such that it seems likely that his or her issuing of such information would be expected.

Again, the name ordered released on page 10 should also be released on page 11. Furthermore, the name of the doctor in paragraphs 2, 3 and 4 should be disclosed. Other documents indicate that his role in this incident is already a matter of public knowledge.

The identity and role of the person whose identity is concealed by the deletions on page 12 and 13 is also a matter of public record and there is no indication that he or she spoke with an express or implied assurance of confidentiality. The information given is not particularly private. It shall be released.

The person whose identity is protected on pages 14 through 16 was a witness at trial, according to information provided by plaintiff on July 20, 1987. Defendants make no mention of this fact, nor any showing that his identity should be protected in spite of it. There is no indication that he spoke with either an express or implied assurance of confidentiality. The deletions are improper. *Powell v. United States*, 584 F.Supp. at 1529. The name of the police officer in question may be deleted on page 17, but the agency shall be disclosed for the reasons discussed above. Paragraph 3,

with the exception of the officer's name, shall be released. Paragraph 4 may remain exempt in the interest of the privacy of the person mentioned.

None of the exemptions claimed on pages 18 through 20 is well-taken, with the exception of the name of the Special Agent. The witness whose identity is protected here testified at trial and his role in the incidents in question is publicly known. The third parties whom he mentions on page 20 also testified. There is no reason to believe that any of these people would wish their identities or roles to be kept confidential. Again, defendants do not even mention that these people testified, much less provide a particular showing that this information should be protected in spite of their testimony.

*Document 17* None of the deletions on the cover page through page 5 are well-taken, with the exception of the Special Agents' names and initials. The person whose identity is protected here testified in court with regard to this incident. There is no indication that he spoke with either an express or implied assurance of confidentiality or that he would wish his identity or role in the incidents to be kept confidential. None of the information impinges upon his privacy interests with the exception of the deletions on page 6, which are exempt.

*Document 52* The name of the particular Selective Service employee who provided the information may remain deleted on cover page A. With respect to the rest of the document, many of the persons whose identities are protected by the deletions were trial witnesses or persons whose identities and roles in the events in question were otherwise publicly known. For the reasons discussed above, many of them shall be released.

Specifically, on page 1 the name of the first person mentioned in the synopsis need not be released; however, the second and third names shall be released, along with the text about the third person. The deletion in the last line of that paragraph may stand. On page 2, the name of the person mentioned in paragraph 1a may remain deleted, 1b shall be disclosed and 1c may remain deleted. On page 3, the person in paragraph d shall be disclosed as shall the person in paragraph e. The name of the person in paragraph f may remain deleted. The person in paragraph g shall be disclosed. The first person mentioned in paragraph h shall be disclosed; the name of the second may remain deleted. The person mentioned on page 4 may remain protected. On page 5, the person named at 1a may be protected; 1b shall be disclosed; 1c may remain protected; and 1d shall be disclosed as shall the paragraphs of text following 1d. The name designated 1h, however, may remain deleted from this paragraph. 1e shall be disclosed; 1f is exempt; and 1g shall be disclosed. The name of the Special Agent in paragraph 3 may remain deleted.

The deletions on pages 6, 7 and 8 may stand. The court was unable to find the person interviewed at pages 7 and 8 in any of the documentation of witnesses who testified or who were known to have observed the events in question. However, if defendant is aware that this person's role was known then his name here and elsewhere shall also be disclosed. The person identified at pages 6, 7 and 8 spoke freely with agents, appeared in a newspaper photo related to the incident, indicated willingness to be located for further interview, and was a witness who could have and may have been called at trial. Thus there is no indication that he provided information with an expectation of privacy and his name shall be disclosed. Pages 9 through 18 contain information from various persons, all of whom testified. All of these deletions shall be disclosed with the exception, as usual, of the Special Agents' names and initials. The deletions on page 19 shall be disclosed. The deletion on page 20, paragraph 1 may stand. The remainder of the deletions on that page shall be disclosed. As to page 21, the fourth name and information about the person named shall be disclosed. The remainder of the information is properly deleted in the interests of the privacy of the persons mentioned.

*Document 61* The (b)(7)(C) exemption claim on page 1 is well-taken. The (b)(7)(D) information on the first and second pages shall be disclosed as the person mentioned here was not interviewed and did not become a source. Disclosure of the name on these two pages would not lead to identification of the person named on pages 3 and 4 who was interviewed and may be protected as a confidential source.

*Documents 252 through 397* The deletions on these pages are well-taken. The privacy interests of third persons which would be impinged by release of these documents outweighs the somewhat attenuated public interest in their disclosure.

*Document 398* The deletions in this document protect the identity of a person who stated that he was willing to testify. Accordingly, it does not appear that he desired that his interview remain confidential. Nothing in the report impinges upon his privacy interest with the exception of the information on cover page A, the last line of page 1, and lines 7–10 on page 6.

*Documents 405 and 406* The deletions here are properly exempt. Release of the information would unjustifiably impinge upon the privacy interests of third parties mentioned with no correspondingly weighty public interest.

*Document 408* The first person mentioned in the synopsis on page 1 may be protected. The second, third and fourth persons mentioned shall be disclosed. The information in the last two lines of the synopsis is exempt for reasons of the privacy of a third person mentioned. The first deletion on page 3 is proper, the second is not. The deletion on page 5 may stand. The information deleted on page 6, paragraphs 1, 2 and the first three lines of paragraph 3 shall be disclosed. The person whose identity is protected here appeared voluntarily at an FBI office to give information. There is no indication that (s)he did so with any expectation of confidentiality. The third person mentioned in paragraph 3, lines 6 through 12, may remain

exempt in the interest of his privacy. The deletions in paragraph 4 are not well-taken.

The deletions on pages 7, 8 and 9 may stand in the interest of privacy of third persons mentioned, which is not outweighed by the public interest. The deletion on page 10, paragraph 1 shall be disclosed; paragraph 2 need not be. On page 11, the information at III may remain deleted in the interest of the privacy of the person mentioned, which is not outweighed by the public interest. The name deleted in paragraph IV, subparagraph 1, shall be disclosed as this person testified in court and no reason is advanced to protect his identity in spite of his testimony. The name of the person protected on page 12 may remain deleted as the court was unable to find any indication that he testified or that his role in the events was known. The person whose identity is protected on pages 13 through 16 testified and did not appear to desire confidentiality. A third person mentioned on page 14, paragraph 2, lines 3 through 5, may be protected. He does not appear to be mentioned elsewhere, and his privacy interests are not outweighed by the minimal public interest in his identity.

EXHIBIT D—MARGUERITE HIGGINS

*Document 22*

*Page 1* The Special Agent's name may be deleted here as throughout, except where specifically mentioned. The alias in the second deletion has been released elsewhere and shall be released. The third deletion is properly taken in that its release would disclose intelligence capability. [Exemption (b)(1)]

*Page 2* The temporary source symbol numbers should be released where the identity of the source has been disclosed. The deletions made in the first full paragraph pursuant to Exemption (b)(1) are overruled. The "source" and "intelligence capability" demonstrated here are self-evident. The (b)(1) deletions in the second full paragraph are well-taken.

*Page 3* The temporary source symbol number here shall be released if the underlying source has been released.

*Pages 5 and 6* Plaintiff does not seek the identity of agencies of this type. The T-numbers here shall be disclosed if the underlying source has been disclosed.

*Pages 17, 18 and 19* Only the (b)(2) exemptions are upheld. The rest of the page shall be disclosed.

*Page 21* Lines 4 through 6, 9 and 10 of paragraph 1 contain Special Agent names which may be protected. The remaining deletions in this paragraph are based on exemption (b)(1). However, the only "intelligence capability" they reveal is self-evident. They shall be disclosed. The (b)(5) exemption claim raised by the Air Force here and on page 22 is frivolous. The document contains no "advice, opinions or suggestions" and does not reveal any deliberative process. All information on this page shall be disclosed except as allowed above.

*Page 22* The information on this page shall be disclosed except for informant information, which is exempt pursuant to exemption (b)(1), unless the source has been revealed.

*Page 23* The T-numbers shall be revealed here for the reasons discussed above.

*Page 25* Only the (b)(2) exemption is upheld. The rest of the page shall be disclosed.

*Page 52* The first deletion on page 1, the alias, is disclosed elsewhere and shall be disclosed. The deletions in paragraph 1 shall be disclosed for reasons discussed above. Given the nature of the information in paragraph 2, the passage of time, and the deaths of Marguerite Higgins and the other person mentioned, it seems extraordinarily unlikely that release of this information would allow anyone to discern the identity of the source of the information. Unless some further showing can be made, this information shall be released.

The comments above apply to page 2 as well. The intelligence-gathering method mentioned here is self-evident and thus can be disclosed safely, unless some further showing can be made.

*Summary* The court emphasizes that all documents in this file shall be turned over in their entirety except to the extent that (b)(1) and (b)(2) exemptions are allowed.

### EXHIBIT E—CLARK KERR

*Document 2* The deletions on page 2 attempt to conceal an incident which, as plaintiff correctly points out, is revealed extensively elsewhere. The only further fact that appears here is confirmation that the FBI investigated the incident. However, the nature of the incident is such that it is self-evident that the FBI would take an interest in it and no further invasion of privacy appears from confirmation that it did. Defendants' declarant Llewelyn at paragraph 242 states that information is released if the subject is obviously known to be the subject of investigation. That is certainly the case here. This information shall be released here and elsewhere.

*Document 27* The prefix of the file number here can be released, and the file number as a whole shall be released if in fact it is Kagel's. The FBI's interest in him and the reasons for it are obvious from other documents, and nothing further would be revealed by this release.

*Document 33* The deletion at page 1 has been rescinded by the Central Intelligence Agency ("CIA"). The justification for its prior withholding is not apparent. The information on page 2 shall be revealed for the reasons discussed above in connection with document 2.

*Document 56* The court finds no "rational nexus" between this particular document and the law enforcement duties of the FBI. Considering the information—or lack thereof—developed about Dr. Kerr's affiliation with subversive organizations in the FBI's 1953 applicant suitability investigations (see E 133), the kind of "information" presented in this document (see espe-

cially paragraph 4, lines 4–8) does not indicate a "good faith belief that the subject may violate or has violated federal law." This is especially true since the document post-dates *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), which established that the Smith Act and analogous laws allowed prosecution only of active members of the Communist Party with specific intent to advocate the forcible overthrow of the United States Government. See *Lamont v. Dept. of Justice*, 475 F.Supp. at 774.

Defendants do not controvert plaintiff's allegation that no applicant suitability investigation was underway in 1958 to justify compilation of this information. Rather, its purpose, as described in related Document 134, was "merely for [the Bureau's] information and in the event that the Bureau may receive some inquiry concerning Dr. Kerr, who at best is a highly controversial figure in California education." Accordingly the (k)(5), (j)(2) and (b)(7) exemptions are not well-taken. Although not claimed, the Court has considered Exemption (b)(6) and finds that the high degree of public interest in this document outweighs the privacy interests of the individuals mentioned, especially given their public positions.

Furthermore, if the confidential source of this information is deceased or already disclosed, as may be the case, the information would not be exempt even if a law enforcement nexus existed.

*Document 65* There is no indication that the person whose name is deleted on page 1 desired or was promised confidentiality. In fact there are indications to the contrary. Defendants argue an implied assurance of confidentiality from the nature of the information. However, this would certainly be outweighed by an express statement that confidentiality was not desired. Furthermore, the person mentioned here is disclosed in documents provided by plaintiff. The person mentioned on page 2 at line 4 shall be disclosed. The FBI's investigative interest in the person mentioned at lines 5 through 6 is apparent from other documents and the name shall be disclosed here. As to line 7, the fact that the FBI is attempting to interview a certain person does not qualify that person as a confidential source; the name shall be disclosed.

*Document 67* Defendants claim that this document recites that the reporting officer states that the source here needed confidentiality. However, the document does not support this claim. The name on pages 1 and 2 shall be disclosed. As plaintiff states, there is no showing that the source in the last deletion on page 2 was an applicant suitability interviewee as defendants claim. A further showing would be needed to justify this deletion.

*Documents 69, 70, 71 and 73* The information deleted here was fully disclosed in earlier FOIA releases. In fact, plaintiff cited unredacted copies of some of these very documents to the FBI in June 1986, in support of his inclusion of Mr. Combs in his list of disclosed sources. Although defendants had agreed to reprocess the documents in light of plaintiff's showing, these redactions were still claimed in October 1986. Plaintiff pointed this out again in his second declaration in support of his motion for summary judgment, filed February 23, 1987. Nevertheless, defendants continued to claim these exemptions in the documents submitted for *in camera* review on May 19, 1987. Finally, on November 2, 1987, Documents 71 and 73, but not documents 69 and 70, were released. Defendants' only explanation is "inevitable processing inconsistencies." These circumstances raise serious doubt about the care and good faith with which defendants have processed these requests.

*Document 72* It may be, as plaintiff argues, that there was no legitimate law enforcement or applicant suitability purpose to the information protected here. However, the deleted source volunteered his information to the FBI and asked for confidentiality in the apparent belief that his information did not have law enforcement implications. That he may have been

wrong should not necessarily result in disclosures that would be embarrassing to him. This source is not on any of plaintiff's lists of deceased or revealed sources. The information that would lead to his identity should be concealed pursuant to exemption (b)(6), if not (b)(7)(C) or (D). However, the person mentioned on page 1, paragraph 1, lines 1 and 2, and paragraph 3, line 4, shall be disclosed. Further, the second deletion at page 2, line 5, could safely be disclosed. The last sentence on page 4, continuing to page 5 shall be disclosed, exclusive of the name. The last paragraph, line 1, second deletion, shall be disclosed.

*Document 80* The deletion here is an attempt to protect the identity of a person who gave a certain letter to the FBI. Defendants claim a Privacy Act (k)(5) exemption even though the letter was received after the last background check on Dr. Kerr was completed. Defendants explain that volunteered information about Dr. Kerr was placed in his existing applicant suitability files. Defendants' filing system, however, does not convert volunteered information into information gathered by the FBI solely for the purpose of an applicant investigation. While the source might feel some embarrassment over providing the information, given the source's public position, this consideration is outweighed by the public interest. The letter shall be disclosed in unredacted form.

*Document 87* This document likewise cannot be converted to a (k)(5) exempt document by being placed in an applicant suitability file. The court does not concur in defendants' view that the face of the document implies a desire for confidentiality. The document relates to a meeting of a public body and the informant volunteered the information. There is no suggestion that he expected confidentiality and, given his position, he should not have expected it. The name deleted here shall be released.

*Document 89* This document is the same as *Document 141* and will be discussed below.

*Document 127* For reasons discussed above, the deletions on this page, with the exception of the Special Agent's name, the T-number and the commercial institution name, are not properly taken. On page 2, the name and identification of a source who asked for confidentiality and the permanent source symbol number of a second source are properly deleted. The last two sentences, however, are too general and the document too old to tend to identify a source. Some documents submitted by plaintiffs are relevant on this point.

*Document 133* The temporary source symbol number on pages 1 and 2 need not be disclosed. Plaintiff does not contest the deletions on pages 5 through 8a, and 10 through 13. The deletion on page 8a, paragraph 4, shall be disclosed for the reasons discussed above, with the exception of the name and address in the last two lines of the deletion. The source in paragraph 5 need not be disclosed. Plaintiff does not seek the names of financial institutions who cooperated with the FBI.

Page 9, paragraphs 1, 2, 3 and 7 shall be disclosed for the reasons discussed above. The name and address of the third party appearing on page 9a, paragraph 1, not released elsewhere, may be deleted. The rest shall be disclosed. Paragraph 2, lines 3 and 4 shall be disclosed for reasons discussed above. Lines 5 and 6 are properly deleted as revelatory of a confidential intelligence source or method. Lines 6 through 9 are properly exempt as impinging on the privacy interests of a tangential third party.

It is not at all apparent how the deleted information in paragraph 3 would disclose an intelligence source or method. Unless a further showing can be made, it shall be disclosed. The second and third names in the paragraph, however, may remain deleted for reasons of privacy. Paragraph 5, lines 1 through 3, shall be disclosed for reasons discussed above. Lines 4 through 7 contain deletions for which exemption (b)(1) is claimed. It is unclear how this information would disclose an intelligence

source or method. The information could have been obtained from many sources by several methods. The particular method mentioned in the declaration is an obvious one. Absent a further showing, this information shall be disclosed.

One of the temporary source symbol numbers on page 14 shall be disclosed. As long as the identity of a source is disclosed, there would appear to be no reason not to disclose its temporary number. The remaining exemptions on that page are well-taken. The deletions at page 15 are not well-taken for reasons discussed above.

*Document 134* This document is related to Document E 56, and the analysis and outcome are the same.

*Document 137* The source here earlier requested and was given an express assurance of confidentiality. The deleted information would identify this source. While there may not be a law enforcement purpose for the information, disclosure of the source's role would be embarrassing. Since the source is tangential, public interest does not outweigh his privacy interest and a (b)(6) exemption is proper.

*Document 138* The first source mentioned here shall be disclosed for reasons discussed above. The name in the heading shall be disclosed, as it is disclosed elsewhere. The facts disclosed about this person are well-known and it is self-evident that these facts would have aroused FBI interest. Thus, the further information that these facts did arouse FBI interest involves no additional invasion of privacy. The third source shall be disclosed as the information was given in sworn testimony and thus was not intended to be confidential.

*Documents 140 and 141* Release of Document 141 (aka Document 89) would reveal the source of that document, who is also protected in Document 140. However, defendants do not claim a law enforcement purpose for this collection of information. Defendants' (k)(5) claim is not applicable since the information was received after the last background check on Dr. Kerr.

Plaintiff's documents indicate that the role of this source is well-known. Thus, although this source might be embarrassed at disclosure of the particular activity he engaged in in this instance, the information here is relatively significant to the public interest and on balance the court concludes that the information shall be released.

*Document 183* Defendants' claims with regard to the source on page 1 are extremely puzzling and raise further doubts about the care and good faith with which these requests were processed. Defendants initially claimed that this source desired confidentiality. They then conceded that their documents specifically reflected that the source stated he did not desire confidentiality. Then, finally, in defendants' reply to plaintiff's "counter-*Vaughn* index," they revert to claiming that this source did desire confidentiality. Defendants further claimed that identification of this source would lead to identification of others within the document. This claim is specious as there is no relation between this source and the others in the document. This source shall be revealed.

The source deleted in paragraph 2 provided positive information about Dr. Kerr. This does not lead to an inference that he desired confidentiality. The deleted source at page 2 shall be revealed for the same reason. The source at pages 3 through 5 shall be disclosed for reasons discussed above. The fact that the source at page 6 gave positive information leads to an inference that he did not desire confidentiality. His name shall be disclosed.

*Document 187* The deletion at page 1, paragraph 3, properly protects the identity of an applicant suitability source who requested confidentiality. The deletion at page 2, line 1 is properly taken. The source at line 9 shall be revealed. Defendants' claim, in their "Justifications" filed May 19, 1987, is that the release provided by plaintiff for the information in paragraph 2 was too old to be accepted by the IRS. Plaintiff responds that the release was timely when provided but became too

old only because the FBI delayed in providing it to the IRS. Defendants do not reply to this claim. The information shall be released. This tactic on defendants' part raises further doubt as to the good faith with which they processed these claims.[1]

*Document 188* Again, the positive sentiments expressed by the informants on page 3, paragraphs 4 and 5 and page 4, paragraphs 1 and 2 lead to an inference that they did not desire confidentiality. In addition, one of them is disclosed elsewhere. The deletions on page 4, paragraph 3, page 5 and page 6, paragraph 2 are not well-taken for reasons discussed above. The date in paragraph 6 may remain deleted. The first four deletions on page 7 protect a source who does not appear to have expected confidentiality, and so shall be revealed. Since the only claim with regard to the last deletion is that it would disclose the source of the story, it shall also be disclosed.

The first deletion on page 8 is properly taken in the interest of the privacy of a tangential third party. Paragraphs 2 and 3 properly protect the identity of a source who requested confidentiality, as does page 9, paragraph 1. Page 9, paragraph 2 shall be disclosed. The source in paragraph 3 may be protected. The nature of the information gives rise to an implied assurance of confidentiality. Defendants further argue here, as elsewhere, that an implied assurance of confidentiality should be inferred from the fact that a source had access to information few others had. This claim makes no sense if the information given did not make use of such restricted access.

*Document 227* The title and deleted paragraph on the cover page shall be disclosed for reasons discussed above. Page 2, paragraphs 2, 3 and 4 need not be disclosed; plaintiff does not seek the names of financial institutions or temporary source numbers. Paragraph 5 contains a proper deletion for a permanent source symbol number. However, the remainder of the information presented is too old and too general to identify the source. Documents presented by plaintiff are relevant here. This information shall be disclosed. Page 3, paragraphs 3, 4, and 5 properly protect the privacy interest of third parties who are tangential to plaintiff's interests.

*Document 239* The deletions here are properly taken. [Exemption (b)(1)]. Plaintiff's concern that the documents were classified after the date scheduled for their release is ill-placed.

*Document 244* Again, plaintiff's concern that the document was classified after its release date is ill-placed. However, the deletion does not disclose to the court any information regarding an intelligence method. It shall be released.

## EXHIBIT F—COINTELPRO

*Document 64* Defendants claim that this entire document is exempt as providing information about intelligence analysis, sources and methods. The court finds that much of Part I is in the nature of an essay on the political movement in question. It draws on public sources such as books, newspapers, current events and the views of well-known philosophers. It does not appear to disclose any intelligence sources or methods. The opinions expressed by the author do not appear to correlate to any particular actions, interests or methods. The method of analysis used is not particularly distinctive. One might expect to read an essay such as this in a magazine. Accordingly, the court has determined that certain portions of Part I can properly be released: the cover page; paragraphs 1 and 2 of the Introduction; the Table of Contents, exclusive of the list of countries; the cover page of Part I; page 1 through paragraph 1 of page 4; page 5, paragraph

---

**1.** The court notes that in their summary judgment pleadings, defendants argued that the reason for withholding tax information was that plaintiff did not supply a release specific to tax information. Plaintiff did not dispute that, but responded that an agency regulation was not sufficient to trigger exemption (b)(3). Apparently this argument has been abandoned by defendants.

2 through page 7, paragraph 2, exclusive of the footnote; page 8, paragraph 3 (exclusive of the footnote) through page 9, paragraph 2; page 10, paragraph 2 through page 11; page 12, paragraph 2; page 13, paragraphs 2 and 3; page 14, paragraph 3 through page 15, paragraph 2, exclusive of the footnote.

The names of government agents and identifying numbers are properly deleted.

Part II of this document contains specific information with regard to foreign groups and individuals that could well reveal intelligence sources and interests. However, Part II also contains information regarding a number of groups and individuals, many of whom are well-known and whose political sentiments have been public knowledge for some time. Wholesale exemption is not justified where there has been no attempt to justify the particular deletions. Since there has been no attempt to particularize or distinguish among groups or individuals, the exemption is abused and Part II shall be turned over in its entirety.

### EXHIBIT H—MAX SCHERR

*Document 2* Plaintiff has established that the person mentioned on page 1 and the information about him or her has been released elsewhere. Absent an additional showing, it appears that nothing new would be disclosed by release of the information here, with the exception of the last sentence of paragraph 2, which may properly remain deleted as tending to identify an intelligence source.

*Document 6* The temporary source symbol numbers on page 1 need not be released. The information in paragraph 1 is disclosed elsewhere and shall be disclosed here. Paragraphs 2 through 4 are properly deleted to protect a confidential source.

The deletions on page 2, paragraph 1 are also proper to protect a confidential source. However, the name and address contained herein shall be disclosed. The information

in paragraphs 2 and 4 is well-known and its release would not disclose the source. Paragraphs 3 and 5 may remain deleted. Paragraphs 6 and 7 shall be disclosed, with the exception of the name of a third party therein, as it is information discussed elsewhere that would not identify the source. The information deleted from page 3, paragraphs 1, 2, 4 and 5, except the source in number 5, shall be disclosed, for the same reasons.

The deletion on page 4, paragraph 2 is proper. The identities of the T-number sources are properly protected.

Much of the information that the court ordered disclosed above is addressed in the declaration of Sherry Davis. She is concerned that disclosure of this information would disclose a particular source and characteristics thereof. However, a reading of the deleted information does not suggest to the court that the source or its characteristics would be implicated by release of the information. The information shall be disclosed.

### EXHIBIT J—CACTUS PROGRAM

*Documents 2 and 3* Virtually all of each of these two documents was originally withheld by the CIA. On October 27, 1986, portions of the documents were disclosed, indicating that CACTUS was a cryptonym for use in teletype communications between the FBI and the CIA. The CIA still claimed, however, that further release would reveal a "CIA administrative methodology used to restrict the flow of sensitive information ... still utilized at the present time...." Dube Decl., October 28, 1986, ¶ 38.

On September 1, 1987, however, the CIA further revealed the subject matter that should be denoted "CACTUS," and that use of the cryptonym would facilitate prompt action on the communication. With that release, most of the information in the documents was revealed, and it became apparent that no "administrative methodology" was mentioned other than the use of the cryptonyms and teletypes, both of which were already apparent from the 1986 dis-

closure. This chain of events raises still more doubt about the care and good faith with which plaintiff's FOIA requests were processed.

The remaining deletions protect only examples of the types of teletypes that should be designated CACTUS, and names of government agents. These are properly deleted, since they would either disclose particular matters of intelligence interest to the CIA or invade the privacy of third persons mentioned who are not well-known or who are tangential to plaintiff's inquiry, or both. [Exemptions (b)(1), (b)(3) and (b)(6) ].